# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : No. 06 - 270 |
| Plaintiff, | : |
| v. | : **COMPLAINT** |
| | : |
| HYDROFLO, INC. and DENNIS MAST, | : |
| | : |
| Defendants. | : |

Plaintiff Securities and Exchange Commission ("Commission") alleges:

1.      Between August and October 2005, Defendants HydroFlo, Inc. ("HydroFlo"), and Dennis Mast, then the chief executive officer of HydroFlo, defrauded investors by making materially false and misleading statements about Hydroflo's water treatment business and investment value in seven press releases authored or approved by Mast.  HydroFlo and Mast misled investors by (i) mischaracterizing an agreement involving a subsidiary's consignment customer as a guaranteed contract entitling the subsidiary to $210 million of revenue; (ii) touting a positive stock analyst report without disclosing that HydroFlo had paid $19,500 for the analyst coverage that the Company insisted in a press release was "independent" and "unbiased"; and (iii) repeatedly publishing false statements concerning the provision of filtration equipment to Hurricane Katrina relief efforts when in fact the company had not shipped any products.  These misrepresentations had the effect of increasing trading volume in, and the price of, HydroFlo's common stock.  Between August 15 and October 5, 2005, the price of Hydroflo's common shares rose from $0.19 to $1.08, an increase of more than 500 percent.

2.     After the Commission's staff had notified Mast of its concerns regarding certain statements in HydroFlo's press releases, the defendants issued supposedly "corrective" releases that reiterated certain false and misleading information regarding the purported $210 million contract and continued to erroneously state that a shipment of water filtration systems had been sent to Hurricane Katrina victims.

3.     By engaging in the acts alleged herein, the defendants engaged in, and unless restrained and enjoined by this Court will continue to engage in, transactions, acts, practices, and courses of business that violate Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

4.     The Commission seeks a judgment from the Court: (a) enjoining the defendants from engaging in future violations of the above sections of the federal securities laws; (b) barring Mast from serving as an officer or director of a public company, pursuant to Section 21(d)(2) of the Exchange Act; (c) barring Mast from participating in an offering of penny stock, pursuant to Section 21(d)(6) of the Exchange Act; and (d) ordering the defendants to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act.

## JURISDICTION

5.     The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

6.     The defendants made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, practices, and courses of business alleged herein, certain of which occurred within the Eastern District of North Carolina.

7.     Venue is proper in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. The court properly has venue over this action because certain of the conduct at

2

issue occurred in the Eastern District of North Carolina, and both defendants are located, reside, or conduct business in this District.

## THE PARTIES

8.    The plaintiff is the Securities and Exchange Commission, which brings this civil action pursuant to authority conferred on it by Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)].

9.    Defendant **HydroFlo, Inc.**, is a North Carolina corporation with its principal place of business in Apex, North Carolina. Effective March 4, 2004, HydroFlo elected to be regulated by the Commission as a business development company ("BDC"), which enabled HydroFlo to raise up to $5 million in a twelve-month period through public sales of its common stock without having to file a registration statement for the securities sold.

10.    Defendant **Dennis Mast**, age 46, is a resident of North Carolina. At all relevant times, he was the chief executive officer of HydroFlo and chairman of its board of directors. Mast owns, through Free Harbor, LLC, an entity that he controls, 13.46 million shares of HydroFlo stock (as of June 30, 2005), which represents approximately one-third of the company's outstanding stock.

## FACTS

11.    HydroFlo common stock is registered with the Commission pursuant to Section 12 of the Exchange Act and, until recently, traded under the symbol HYRF on the Over the Counter Bulletin Board. It now trades on the Pink Sheets, which is a daily publication compiled by the National Quotation Bureau that provides bid and ask prices of stocks traded over the counter.

12.    Beginning in 2004, HydroFlo made two public offerings of stock pursuant to Regulation E of the Securities Act of 1933 ("Securities Act"). Regulation E permits companies

3

that have elected to be regulated as BDCs to raise up to $5 million per year through offerings exempt from the registration requirements of the Securities Act. HydroFlo's first offering raised approximately $1.7 million. HydroFlo's second offering, which commenced on October 10, 2005, and remains open, seeks to raise up to $5 million.

13. HydroFlo owns several operating subsidiaries that operate or plan to operate in the water treatment industry. One of HydroFlo's subsidiaries is Metals & Arsenic Removal Technology, Inc. ("MARTI"). MARTI markets water filtration systems that MARTI claims reduce levels of arsenic and other contaminants in drinking water.

## I. FALSE AND MISLEADING PRESS RELEASES CONCERNING A PURPORTED $210 MILLION CONTRACT

### A. August 15, 2005 Press Release

14. On August 15, 2005, HydroFlo issued a press release announcing that its wholly-owned subsidiary, MARTI had received an "agreement amendment" from a customer, Essentially Yours Industries, Inc. ("EYII"), to supply water filtration systems. The press release stated that "[t]he total value of the order is expected to exceed $210 million." Mast approved this release and caused HydroFlo to issue it.

15. This press release was false and materially misleading because, as HydroFlo acknowledged in a subsequent press release that it issued on October 26, 2005, after having been contacted by the Commission's staff, "EYII did not and has not placed an order with MARTI for any particular quantity or dollar volume of products." In fact, MARTI had only a consignment agreement to supply products to EYII, and EYII was not obligated to purchase anything from MARTI.

16. HydroFlo's statement that "[t]he total value of the order is expected to exceed $210 million" was also materially misleading. The purported order in question was between EYII and a

4

Chinese manufacturer called China Electronics Import and Export South China Corporation ("CEIEC"). Neither MARTI nor HydroFlo was a party to that contract. Further, the EYII/CEIEC contract set no minimum purchase requirements, and Mast privately expected HydroFlo and MARTI to realize only approximately $1 million in revenue for fiscal year 2005 from EYII.

**B.    September 27, 2005 Press Release**

17.    On September 27, 2005, HydroFlo issued a press release bearing the heading "MARTI Distributor Signs Guaranteed 2 Year $42 Million Agreement With Chinese Distribution Company." The release stated that MARTI "will produce and supply [EYII] and China Electronics Import and Export South China Corporation (CEIEC) with $42 million worth of Water Pitchers and Filters." The release further asserted that CEIEC "must purchase a minimum of $21 million in product in each of the years 2006 and 2007." Mast drafted and caused HydroFlo to issue this release.

18.    This press release was false and materially misleading because (i) the EYII-CEIEC contract did not provide for any "guaranteed" revenue to MARTI or HydroFlo and (ii) neither EYII nor CEIEC was contractually required to order any products at all from MARTI under their consignment arrangement. HydroFlo subsequently acknowledged that "[n]either the [contract between EYII and CEIEC] nor MARTI's own agreement with EYII require the purchase of particular quantity or dollar amount" of MARTI products.

19.    HydroFlo's public statements about this contract were further misleading because they created the false impression that the $210 million contract and the $42 million contract were two separate contracts. The September 27 press release announcing the "guaranteed" $42 million agreement failed to disclose that it concerned the same transaction as discussed in the August 15, 2005 press release announcing a $210 million agreement amendment.

## C.  September 28, 2005 Press Release

20.     On September 28, 2005, HydroFlo issued a press release, drafted by Mast, entitled "HydroFlo Portfolio Company MARTI Values EYII Contract Announced Yesterday at $210,000,000 Over Next Two Years." This press release was materially misleading because (i) the EYII/CEIEC contract included no minimum purchase requirements, and thus neither EYII nor CEIEC was required to purchase any products from MARTI; and (ii) even if CEIEC had purchased from EYII the entire amount contemplated under the contract, HydroFlo's subsidiary, MARTI, would not have received $210 million. According to EYII's public statements, EYII could be paid $210 million if CEIEC purchased the maximum amount of product it was permitted to purchase under the contract. The revenue realized by MARTI, however, would have been substantially less, because EYII would have paid MARTI, its supplier, only a percentage of any revenue that EYII received from the contract. Indeed, HydroFlo later stated in a corrective release that it issued on October 26, 2005, after conversations with the Commission's staff, that "the figure cited in the press release is a projection of revenue to [EYII] arising out of its own agreement with [CEIEC], not a projection by MARTI of its own expected revenues from the arrangement."

21.     After the Commission's staff notified HydroFlo of its concerns regarding the company's statements in press releases, the company initially issued two purportedly corrective releases, on October 6, 2005 and October 7, 2005. The "corrective" releases, however, reiterated the claim that the "value" of the EYII-CEIEC contract to HydroFlo/MARTI was $210 million and continued to describe the contract as a "guaranteed" $42 million agreement. Both press releases were drafted by Mast.

22.     After additional discussions with the Commission's staff, HydroFlo issued another corrective release on October 26, 2005, in which HydroFlo conceded that (i) neither HydroFlo nor

6

any of its portfolio companies had an agreement with CEIEC; (ii) neither MARTI's agreement with EYII nor EYII's agreement with CEIEC guaranteed the purchase of particular quantities of products from MARTI or HydroFlo; and (iii) the $210 million projection was the amount that EYII had reported as CEIEC's projected purchase from EYII during the stated period, and did not represent a reasonable projection of the revenues, if any, that HydroFlo would receive from the contract.

23.     Each of defendants' statements regarding the EYII contract was material. For the quarter ended March 31, 2005, HydroFlo reported the value of its investment in MARTI at only $865,000. A contract "valued" at $210 million, or one that "guaranteed" $42 million in revenues over two years, would have exponentially increased MARTI's revenues, far exceeding MARTI's prior earnings.

24.     Defendant Mast either drafted or reviewed and approved the press releases concerning the EYII-CEIEC contract prior to their issuance and he knew or was reckless in not knowing that the statements contained in the releases were false and materially misleading.

## II.     PRESS RELEASES CONCERNING A PURPORTED "INDEPENDENT ANALYST REPORT"

### A.     October 4, 2005 Press Release

25.     On October 4, 2005, HydroFlo issued a press release, approved by Mast, stating that Wasserman Morris and Company, "an independent investment research firm," had initiated research of HydroFlo. The release further stated that Wasserman Morris had "upgraded the previous price target from $0.47 to $2.10 well above its current trading price while maintaining a 'Speculative Buy.'" The release also asserted that Wasserman Morris provides "un-biased" research on "under-followed" stocks.

7

26.     The price of HydroFlo's common stock increased thirty-three percent after the issuance of the press release, rising from $0.88 at the close of the market on October 3 to a high of $1.17 on October 4.

27.     The press release was materially misleading because it touted Wasserman Morris's coverage as "un-biased" and "independent," while failing to disclose that HydroFlo had paid Wasserman Morris $19,500 for the coverage.

28.     The press release was also materially misleading because it touted the Wasserman Morris price target and "upgrade" even though the report was based on information that Mast knew to be false, including (i) that the EYII/CEIEC contract "is likely to provide [HydroFlo] with roughly $210 million in revenues for the next two years;" (ii) that "[HydroFlo] is actively involved in the restoration of basic sanitary living conditions" in hurricane-affected areas; (iii) that a contract to supply water filtration units in the United States "could also bring HydroFlo up to $7.5 million in revenues;" and (iv) that Wasserman Morris "expect[s] HydroFlo's management to secure a portion of the $100 billion that are being made available for disaster relief."

29.     HydroFlo's corrective press release, issued on October 26, 2005, disclosed that the Wasserman Morris report "contained a number of inaccurate or incomplete statements about the company." The release stated that (i) neither HydroFlo nor any of its portfolio companies have an agreement with CEIEC; (ii) neither MARTI's agreement with EYII nor EYII's agreement with CEIEC guarantees the purchase of particular quantities; (iii) the $210 million projection is the amount that EYII reports as CEIEC's projected purchase from EYII during the stated period, and not representative of HydroFlo's expected revenues; (iv) that the $7.5 million revenue projection contained in the Wasserman Morris report is EYII's projection of its own revenues, not a projection of MARTI's potential revenues.

30.     Wasserman Morris subsequently issued a revised report on HydroFlo, rescinding the price target it had assigned to HydroFlo's stock and downgrading the company from a "speculative buy" to "neutral." The new report stated that Wasserman Morris had downgraded the stock because of the new information divulged in the corrective release that HydroFlo had issued on October 26, 2005.

31.     Although Mast was aware that Wasserman Morris had issued a new, revised report on HydroFlo, in which Wasserman Morris had lowered the price target for HydroFlo, and had downgraded the stock to a neutral, Mast did not issue a press release or otherwise disclose that information to investors.

32.     At the time that Mast caused HydroFlo to issue the October 4 press release concerning the Wasserman Morris research report, Mast knew or was reckless in not knowing that the public statements made in HydroFlo's press release regarding the Wasserman Morris report were false and misleading. Mast knew that the company had paid Wasserman Morris $19,500 for coverage and that this information was not disclosed to investors in the press release. He also knew that the research report and price target were based on false information. Mast subsequently learned that Wasserman Morris had issued a revised report lowering HydroFlo's price target and rating, but did not disclose this to investors.

### III.     FALSE AND MISLEADING PRESS RELEASES CONCERNING DONATIONS TO THE HURRICANE KATRINA RELIEF EFFORT

#### A.     September 12, 2005 Press Release

33.     Following the devastation in Louisiana and Mississippi caused by Hurricane Katrina, HydroFlo issued a press release on September 12, 2005, announcing that its subsidiary, MARTI "has agreed to donate water filtering systems along with consulting services to aid in the Hurricane Katrina disaster relief effort." The release further stated that "[t]he initial commitment

9

for distribution of water pitchers and filters and for 5,000 units" and that "[t]he first shipment is expected to go out this week to DOD and other shipments will follow to FEMA as units are produced by our Chinese manufacturer." Mast drafted and caused HydroFlo to issue this press release.

34.     As HydroFlo conceded in the press release on October 26, 2005, neither the Department of Defense ("DOD") nor the Federal Emergency Management Agency ("FEMA"), or any other government agency, had requested consulting services from HydroFlo or MARTI, and no agency had agreed to accept them. Moreover, at the time of the release, MARTI did not even have 5,000 filtration units to ship that week.

**B.      September 16, 2005 Press Release**

35.     Four days later, on September 16, 2005, HydroFlo issued another press release, also drafted by Mast, that stated that HydroFlo "has committed to supplying 5,000 drinking water filtration units for the victims of Hurricane Katrina." The September 16, 2005 release also stated that another HydroFlo subsidiary, HydroFlo Water Treatment, Inc. ("HWTI"), "will consult with Federal, State and Local officials in an effort to restore sewer treatment and water supply throughout the Hurricane-ravaged areas." The release quoted Mast as saying that the company's lobbyist "is doing all he can to secure a portion of the $100 billion that is being made available for disaster relief." Mast drafted this release and caused HydroFlo to issue it.

36.     The September 16 press release was materially misleading because, as of the date of the release, (i) MARTI had still did not have 5,000 water filtration units that it could ship, nor had MARTI contacted any agency involved in hurricane relief to arrange to supply water filtration systems; and (ii) HWTI had not agreed with any party to donate consulting services.

10

### C.     September 20, 2005 Press Release

37.     On September 20, 2005, HydroFlo announced that MARTI "has donated water filtering systems, along with HydroFlo portfolio company [HWTI] consulting services, to aid in the Hurricane Katrina disaster relief effort" and stated that "[t]he first shipment [of water filtration systems] has been sent out to assist survivors and other shipments will follow to FEMA and the DOD as units are provided by our manufacturers." Mast drafted and caused HydroFlo to issue this release.

38.     The September 20 press release was false and materially misleading because, as of the date of the release, (i) MARTI had neither donated nor shipped any water filtration systems; and (ii) HWTI had not donated any consulting services. HydroFlo confirmed in the press release issued on October 26, 2005, that water filtration systems had not, in fact, been shipped to FEMA or DOD.

### D.     October 7, 2005 Press Release

39.     On October 7, 2005, after the Commission's staff had contacted HydroFlo regarding certain statements in the press releases, the company issued a press release purporting to correct the misstatements made in the September 20 press release. Although the "corrected" release revealed that "[t]he full shipment of 5,000 was ordered on September 19 and confirmation was received that the shipment will be sent from the China plant on October 15, 2005," the release nevertheless was titled "First Shipment of Filtering Systems *Leaves* for Hurricane Katrina Survivors," and falsely reiterated that "[t]he first shipment *has been sent out* to assist survivors and other shipments will follow to FEMA and DOD as units are produced by our manufacturers." (Emphasis added.) Mast drafted and caused HydroFlo to issue this release.

11

### E.    October 26, 2005 Corrective Press Release

40.    After further discussions with the Commission's staff, HydroFlo issued an additional corrective press release on October 26, 2005.  Among other things, the press release addressed the company's claims regarding its involvement in the Hurricane Katrina relief efforts, stating that "[t]o the extent these releases state or imply that HydroFlo's portfolio companies had actually reached agreements with any entities to supply consulting services, they are inaccurate. Certain of those companies have simply offered such services."  The release went on to state that no donated products had been shipped as of September 20 and, in fact, no donated products had been shipped as of the date of the release.

41.    Each of the defendants' statements regarding the company's involvement in the Hurricane Katrina relief efforts was material.  If HydroFlo had actually been involved in the relief effort, this involvement could have potentially granted HydroFlo access to a portion of the federal funds allotted to the relief and resulted in lucrative business for HydroFlo.  The company's touting of purported involvement also could have generated goodwill, as the company and its efforts would likely be viewed favorably by investors.  HydroFlo also used the newsworthiness of hurricane relief to mislead investors into thinking that the company was then in the business of shipping products designed to assist flood victims, when in fact the company had yet to manufacture any such products.

42.    Defendant Mast drafted each of these press releases and approved their issuance when he knew or was reckless in not knowing that the statements contained in the releases were false and materially misleading.

## CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

43.     The Commission realleges and reincorporates paragraphs 1 through 42 as if fully set forth herein.

44.     From at least August 2005 through October 2005, the defendants, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit.

45.     By reason of their actions alleged herein, the defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

### PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

Enter judgment in favor of the Commission finding that the defendants each violated the securities laws and Rule promulgated thereunder as alleged herein;

### II.

Permanently enjoin the defendants from violating Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5];

13

## III.

Order the defendants to pay civil money penalties pursuant to Section 21(d)(3) of the

Exchange Act of 1934 [15 U.S.C. § 78u(d)(3)];

## IV.

Order that defendant Mast be permanently barred pursuant to Section 21(d)(2) of the

Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a

class of securities registered pursuant to Section 12 of the Exchange Act, or that is required to file

reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], based on findings that

Mast's conduct demonstrates unfitness to serve as officer or director of such an issuer;

## V.

Order that defendant Mast be permanently barred from participating in an offering of penny

stock, pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and

## VI.

Grant such other relief as this Court may deem just and proper.

Dated: _7/5/2006_

Respectfully submitted,

_Ot Ch·_

Antonia Chion
Yuri B. Zelinsky
Lawrence C. Renbaum
Stacey M. Nahrwold
Matthew D. Strada
Pamela H. Nolan

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4769
(202) 772-9227 (fax)

14